IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHRISTINA RUTH RICHARDSON                                          PLAINTIFF


        V.                          Civil No. 2:22-cv-02170-PKH-MEF


KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                     DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Christine Richardson, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.        Procedural Background

Plaintiff protectively filed her application for DIB on March 27, 2019, alleging an onset date ("AOD") of March 27, 2019, due to fibromyalgia, chronic fatigue syndrome ("CFS"), interstitial cystitis, anxiety, depression, insomnia, an abnormal gait, chronic pain, a Vitamin D deficiency, anemia, joint pain, a ganglion cyst in her right wrist, and gastrointestinal reflux disease ("GERD").  (ECF No. 10, pp. 29, 78, 98, 171-177, 198, 227-228, 255-256).  The Commissioner denied her applications initially and on reconsideration, and an administrative hearing was held

before Administrative Law Judge ("ALJ") Edward Starr on September 29, 2020.  (*Id*. at 51-80). The Plaintiff was telephonically present for the hearing and represented by counsel.

On her alleged onset date, Plaintiff was 28 years old and possessed a high school education. (ECF No. 10, pp. 43, 199).  She had past relevant work ("PRW") experience as an insurance clerk, housekeeper/cleaner, bartender helper, data entry clerk, and administrative clerk.  (*Id*. at 42, 200, 218-225).

On May 25, 2021, Dr. Subramaniam Krishnamurthi proffered answers to interrogatories propounded by ALJ Starr.  (ECF No. 10, pp. 770-779).  Likewise, on July 26, 2021, vocational expert ("VE"), Tanya Owens, responded to the ALJ's written interrogatories.  (*Id*. at 303-306).

In an unfavorable decision dated September 24, 2021, ALJ Starr concluded that the Plaintiff's fibromyalgia, osteoarthritis, major joint dysfunction, disorder of the gastrointestinal system, anxiety, depression, and personality disorder were severe but did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (ECF No. 10, p. 32).  Despite her impairments, he determined she retained the residual functional capacity ("RFC") to perform light work requiring only occasional climbing stairs/ramps, balancing, crawling, kneeling, stooping, and crouching; frequent fingering, handling, and reaching bilaterally; and no climbing ropers/ladders/scaffolds or work near unprotected heights or moving machinery.  (*Id*. at 33-34).  ALJ Starr further limited her to work involving interpersonal contact that is incidental to the tasks performed; simple tasks; and simple, direct, and concrete supervision. Based on the VE's testimony, the ALJ determined that Plaintiff could perform work as an injection molding machine tender, electrical assembler, and deliverer.  (*Id*. at 43).

On September 6, 2022, the Appeals Council denied Plaintiff's request for review (ECF No. 10, pp. 6-11), and she subsequently filed her Complaint to initiate this action.  (ECF No. 2).  Both

2

parties have filed appeal briefs (ECF Nos. 13, 14), and the matter is ripe for resolution.  The case

has been referred to the undersigned for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the

Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial

evidence is less than a preponderance but enough that a reasonable mind would find it adequate to

support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must

affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v.

Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record to support

the Commissioner's decision, the Court may not reverse it simply because substantial evidence

exists in the record that would have supported a contrary outcome, or because the Court would

have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other

words, if after reviewing the record it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's

decision.  *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability

by establishing a physical or mental disability that has lasted at least one year and that prevents

her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217

(8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental

impairment" as "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques."  42 U.S.C. § 423(d)(3).  A Plaintiff must show that her disability, not simply her

impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  *See* 20 C.F.R. § 404.1520(a)(4).  The fact finder will only consider Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. § 404.1520(a)(4)(v).

### III.    Relevant Medical Evidence

Because the Plaintiff's AOD is March 27, 2019, medical records predating her AOD will only be used to elucidate her condition during the relevant period.  *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (holding records and medical opinions dated outside the relevant period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded").

Records dating back to 2015 document a history of chronic neck, back, knee, shoulder, hand, and foot pain; fibromyalgia; CFS; chronic interstitial cystitis; Vitamin D deficiency; and mixed anxiety and depression.  (ECF No. 10, pp. 317-319, 322-336, 340-345, 362-366, 370-374, 380-385, 461-465).  Macrobid, Meloxicam, Tolterodine, Oxybutynin, Toviaz, Myrbetriq, Egoscue exercises, Frankincense oil, CBD oil, Curcumin, Hydroxyzine, and Vitamin D were tried without significant improvement.  And, on November 17, 2015, the Plaintiff underwent iliopsoas tendon release in the left hip (cutting of the tendon) to relieve pain and restore range of motion ("ROM").  (*Id*. at p. 661).

In 2018, an MRI of the Plaintiff's cervical spine showed mild spondylosis at the C3-4 level, a small central disk protrusion at the C5-6 level, and mild flattening of the ventral thecal sac at the C3-4 and C5-6 levels with no significant canal or neural foraminal stenosis.  (*Id*. at 320-321, 375).  Further, x-rays of her sacroiliac joints and knees showed no significant abnormalities, while an ultrasound of her hands documented normal bone, muscle, tendon, joints, and median nerves with a small ganglion cyst in the right mid-wrist.  (*Id*. at 340, 352, 356-357, 358-359).

In February 2019, Plaintiff's general practitioner, Dr. Michael Cole, prescribed Clonazepam to address her increasing anxiety.  (ECF No. 10, pp. 380-385, 461-465).  The Plaintiff advised him she was very overwhelmed and on the brink of a mental breakdown.  As she was too thin, he advised her to continue taking the appetite stimulant Marinol/Dronabinol and the Vitamin D supplement and ordered an endoscopy work-up that ultimately showed mild chronic inactive gastritis with no evidence of H. Pylori infection.  (*Id*. at 394-400).

By March 21, Mobic was aggravating her stomach and the Marinol was no longer effective.  (ECF No. 10, pp. 346-351).  An exam documented scattered mild to moderate fibromyalgia tender points.  Accordingly, rheumatologist Dr. Russell Branum gave her samples of Pennsaid (a topical arthritis medication) and referred her to Dr. Swicegood to discuss injections.

In June, she returned to Dr. Cole with complaints of easy bruising.  (ECF No. 10, pp. 453-458, 468-470).  An exam revealed tenderness in the neck muscles, hips, knees, and mid-calf with normal ambulation, gait, station, balance, and coordination.  Dr. Cole advised her to resume the Vitamin D supplement, encouraged her to gain weight, and told her to discontinue the appetite stimulant Marinol/Dronabinol as she was also using marijuana.

A week later, neurologist Dr. Janice Keating evaluated the Plaintiff for restless leg syndrome ("RLS") and tremor.  (ECF No. 10, pp. 489-494, 497-500).  Despite complaints of

shaking "all over," an exam showed only a mild to moderate exaggerated psychological/postural tremor in the upper extremities, breakaway weakness throughout all her muscle groups due to diffuse body pain, and a normal mood and affect.  Dr. Keating concluded that her tremor was aggravated by both anxiety and pain and prescribed a trial of low-dose Propranolol (Inderal).  She diagnosed mixed depression/anxiety disorder with some somatization tendencies and recommended a psychiatric consultation, noting that the Plaintiff's addictive and abuse potential for Benzodiazepines was high.

On June 26, 2019, Dr. Samuel Hester conducted a consultative mental evaluation.  (ECF No. 10, pp. 416-424).  She was not currently in treatment, but the Plaintiff reported an extensive history of mental health treatment, since age 12, with one inpatient stay in 2009 due to substance abuse (cocaine).  And, although she was an anxious child with a history of cutting herself, the Plaintiff denied difficulty getting along with others in the workplace.  Dr. Hester noted she did move around as if she were in pain but exhibited only a slightly depressed mood with an appropriate affect, normal speech and thought content, and logical thought processes.  Further, the Plaintiff was alert and fully oriented.  Dr. Hester diagnosed anxiety disorder, adjustment disorder with depressed mood, pain disorder, borderline personality traits, fibromyalgia, cystitis, gastritis, and irritable bowel syndrome.  Regarding her activities, the Plaintiff advised the physician that she could perform most activities of daily living ("ADLs") autonomously but needed assistance getting into and out of the bathtub and buttoning/fastening her garments.  While she maintained the capacity to communicate and interact in a socially adequate manner, communicate in an intelligible and effective manner, cope with the mental demands of work tasks, attend and sustain concentration on basic tasks, and sustain persistence in completing tasks, Dr. Hester concluded she

would likely be unable to complete tasks within an acceptable timeframe due to chronic pain and frequent toileting.

The following day, Dr. Jim Takach reviewed the record and concluded the Plaintiff could perform light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (ECF No. 10, pp. 91-92).

On June 28, Dr. Marilyn Jordan conducted an independent review of the record and found no evidence of a severe mental impairment. (ECF No. 10, pp. 88-89). She assessed the Plaintiff with mild restrictions in the following areas: interacting with others, concentrating, persisting, and maintaining pace. No limitations in understanding, remembering, applying information, or adapting and managing oneself were noted.

In July, gastroenterologist Hrair Simonian treated the Plaintiff for abdominal pain. (ECF No. 10, pp. 531-527). After a physical exam revealed no gastrointestinal tenderness, guarding rebound, or masses, no abdominal distention and a normal gait, ambulation, motor strength, tone, and movement, the doctor diagnosed nausea and abdominal pain and prescribed Zofran. He also ordered a hepatobiliary iminodiacetic acid ("HIDA") scan.

Two weeks later, the Plaintiff returned to Dr. Cole with complaints of mixed anxiety, depression, insomnia, chest pain, and left shoulder pain. (ECF No. 10, pp. 430-434, 445-450, 646-652). As she had applied for disability, she also asked him to complete an RFC assessment. An exam showed her to be in mild distress, anxious, and depressed with a limited ROM and tenderness in her left shoulder. Further, an EKG revealed bradycardia, likely due to Propranolol. However, because it was somewhat helpful to her fibromyalgia, Dr. Cole advised her to continue it. He then diagnosed CFS, bradycardia, fibromyalgia, and insomnia disorder, indicating that her CFS was an ongoing problem that was severe enough to justify long-term disability as there was no expectation

of improvement.  Additionally, Dr. Cole noted that her anxiety and depression had resulted in an increased unwillingness to leave home.  Because the Clonazepam was no longer effective, he advised her to discontinue it but directed her to resume Temazepam.

That same day, Dr. Cole completed a Medical Source Statement.  (ECF No. 10, pp. 435-436).  Having treated the Plaintiff since 2014, he reported diagnoses of chronic pain syndrome ("CPS"), chronic obstructive pulmonary disease ("COPD"), chronic interstitial cystitis, fibromyalgia, CFS, generalized anxiety disorder, and tremor.  Dr. Cole concluded that the Plaintiff's symptoms were severe enough to frequently interfere with the attention and concentration required to perform simple work-related tasks.  He opined the Plaintiff could sit for 45 minutes at a time for a total of 4 hours; stand/walk for 10 minutes continuously for a total of 1 hour; and lift/carry up to 5 pounds frequently, 10 pounds occasionally, and 20 pounds rarely but never more.  Further, Dr. Cole concluded she could use her hands for repetitive actions such as reaching with the right upper extremity but could not reach with the left upper extremity or push/pull, grasp, or fine manipulate with either upper extremity; use her feet for repetitive movements such as operating foot controls; squat, crawl, climb, stoop, crouch, or kneel; or tolerate exposure to unprotected heights.  She would also need unscheduled breaks and could frequently bend, reach above her head, work around moving machinery, drive automotive equipment, and be exposed to noise.

On July 22, Plaintiff consulted with Dr. Cole regarding a recent emergency room ("ER") visit for a possible seizure.  (ECF No. 10, pp. 441-445, 642-646).  She had no history of seizure activity but reported collapsing when she stood up to walk.  Her husband said she fell to the floor, her eyes rolled back in her head, she gurgled, and was trembling all over.  An ambulance was called but the Plaintiff refused transport for financial reasons.  So, her husband drove her to the

8

ER for evaluation.  She had bruising on her buttocks and arms, but a CT scan of her head showed no acute intracranial abnormality.  (*Id*. at 586-587).  The ER physician advised her not to drive until she was medically cleared by neurology.  At the time of her appointment, Dr. Cole noted her to be too thin and in mild distress with abnormal muscle strength; a weak grip; a normal gait, station, balance, and coordination; and a normal mental status exam.  The Plaintiff had discontinued Propranolol, although the ER doctor did not believe it played a role in her episode, as dizziness and faintness are known side effects.  Dr. Cole referred her to Dr. Keating, advised her to discontinue the Ropinirole, and encouraged her to gain weight.  He also renewed his directive not to take Marinol/Dronabinol as she was using marijuana.

Dr. Keating evaluated the Plaintiff on July 30, 2019, concluding that she was likely suffering from an exaggerated physiological tremor, RLS, and severe anxiety.  (ECF No. 10, pp. 481-488).  She advised the doctor that her primary care physician had noted a low heart rate, although Dr. Keating had no record of this, and complained of continued tremors, fear, and anxiety. An exam revealed a depressed and anxious mood; tearfulness throughout the exam; a mild to moderate exaggerated physiologic/postural tremor; and a normal gait with some slow and cautious functional overlay.  Although the Plaintiff was using a large walking stick, she was able to independently walk back and forth across the exam room without ataxia.  After diagnosing syncope and collapse, possibly related to bradycardia with a psychogenic overlay, Dr. Keating recommended that she not drive, climb ladders or scaffolds, or swim alone.  Further, she ordered an MRI and an EEG.  The EEG documented some diffuse low voltage fast frequency beta activity over both hemispheres consistent with medication side effects, while the MRI showed a few scattered increased flair and T2 signal intensities in the subcortical likely related to vasculitis,

demyelinating process, migraine disorder, or early chronic small vessel white matter ischemic change.  (*Id*. at 495-496, 582-583, 590-591).  No evidence of epilepsy was noted on either scan.

In mid-August, the Plaintiff consulted urologist, Dr. John Terrell, for continued complaints of frequency, urgency, and hesitancy of stream.  (ECF No. 10, pp. 504-510, 528-534).  Dr. Terrell also noted the Plaintiff to be too thin.  She was, however, ambulating normally with a cane and exhibited a normal gait, station, muscle strength, and tone with no tenderness.  From a mental perspective, her mood, affect, and memory was unremarkable.  Following a clear urine analysis, Dr. Terrell diagnosed chronic interstitial cystitis, urge incontinence, and bladder muscle dysfunction.  As she had already tried and failed Oxybutynin, Toviaz, and Myrbetriq, he prescribed Tolterodine and advised her to continue taking Macrobid postcoitally.  Further, because she expressed some interest in an InterStim trial, Dr. Terrell indicated she would need clearance from neurology.

A few days later, neurologist Dr. Steve-Felix Belinga evaluated the Plaintiff for her leg cramps and tremors, which she reported to occur both at rest and in response to stress.  (ECF No. 10, pp. 626-629).  An exam revealed a normal mental status exam with fine tremor of the extremities, normal bulk and tone, normal strength in all her extremities, a normal ROM, normal sensation, and an antalgic gait.  After noting what appeared to be substantial degenerative issues in the neck, hip, and knees, which could account for her leg cramping, pain, and paresthesias, Dr. Belinga diagnosed mild sensory neuropathy of the lower extremities.  As she had failed both Lyrica and Gabapentin, he prescribed Primidone and ordered nerve conduction studies that ultimately documented mild sensory neuropathy of the lower extremities.

The Plaintiff returned to Dr. Belinga on September 26, 2019.  (ECF No. 10, pp. 630-632).  She advised him that Primidone was helpful, and Dr. Belinga diagnosed essential tremor,

hereditary and idiopathic neuropathy, spinal stenosis, and neurogenic claudication in the lumbar region.  After noting a very fine tremor in the extremities, a normal mental status exam, normal sensation, coordination, strength in all extremities, normal bulk and tone, a normal ROM, and an antalgic gait (limp), he prescribed Tizanidine.

On November 6, the Plaintiff presented in Dr. Cole's office for continued complaints of insomnia and fatigue.  (ECF No. 10, pp. 660-667, 715-717).  She wanted to taper off Temazepam and try Ramelteon for insomnia.  Plaintiff's gait was consistent with the diffuse muscular tenderness noted on exam, but her coordination was intact, and her mental status was normal.  Dr. Cole diagnosed chronic kidney disease, stage 3; insomnia; fibromyalgia; and CFS.  He prescribed a trial of Gabapentin and Metformin for her fibromyalgia and encouraged weight gain.

In December 2019, Dr. Dan Gardner reviewed the medical record and affirmed Dr. Takach's physical RFC determination.  (ECF No. 10, pp. 108-109).  Likewise, Dr. Jon Mourot conducted an independent review of the evidence and affirmed Dr. Jordan's assessment of no severe mental impairment.  (*Id*. 105-107).

The Plaintiff did not return to Dr. Cole's office until February 7, 2020, at which time she renewed her complaints of nocturia, anxiety, anemia, fibromyalgia, and insomnia.  (ECF No. 10, pp. 568-574, 667-678, 718-733).  An exam revealed mild bilateral costovertebral angle tenderness, a limited ROM in the right shoulder due to pain, an abnormal gait, and a normal mental status.  At the Plaintiff's request, Dr. Cole completed a handicap parking permit form, ordered labs, advised her to gain weight, resumed the Temazepam at bedtime for RLS, increased her Gabapentin dosage, and recommended the use of heat, over the counter ("OTC") arthritis medications, and topical rubs as needed.

Approximately two weeks later, the Plaintiff saw Dr. Belinga in follow-up of her tremors. (ECF No. 10, pp. 633-635). She also reported some right ribcage and right lower extremity bone pain. He noted she had recently resumed Temazepam for RLS but was only taking it twice weekly. Following an unchanged exam, Dr. Belinga noted her to be stable overall. Primidone was still helping, although she continued to shake in response to pain. He indicated this could be a symptom of multiple sclerosis ("MS") which would require further work-up. Dr. Belinga continued the Primidone, Tizanidine, and Gabapentin and ordered a CT scan of her thoracic spine. Although he did not have an alternative to offer her, he also opined she needed to work toward the discontinuation of Temazepam.

When the Plaintiff returned to Dr. Cole on February 26, she was reportedly experiencing marked chest pain in the right lower anterior and lateral chest. (ECF No. 10, pp. 678-684). An exam showed marked tenderness inferior to the medial right breast and in the inferior right sternum but was otherwise unremarkable. Dr. Cole diagnosed costal chondritis and COPD, advised smoking cessation, and prescribed Meloxicam.

On March 3, 2020, Dr. Belinga noted her to be about the same. (ECF No. 10, pp. 636-638). He still could not rule out MS and, although a spinal tap would provide a definitive answer, voiced his fear that performing a spinal tap would aggravate her pain. Dr. Belinga noted her fibromyalgia diagnosis, indicating that she did not like any of the fibromyalgia treatment options offered. As such, he was uncertain how to proceed. Therefore, he advised that she could taper off the Primidone if she wished to do so; should continue Tizanidine and Gabapentin; and prescribed a trial of Requip.

In May, the Plaintiff reported that her tremors had not changed much, but she admitted that they "were not too bad." (ECF No. 10, pp. 639-641). Primidone remained helpful, resulting in

minimal shaking.  Dr. Belinga concluded it was unlikely to be MS, given the level of associated pain and the unremarkable nature of the MRIs of the brain and thoracic spine.  He advised her to continue the Primidone, Tizanidine, and Gabapentin, but to discontinue the Requip.

The following day, a follow-up with Dr. Cole documented a fibromyalgia flare-up.  (ECF No. 10, pp. 684-692, 734).  An exam revealed a rare shallow cough; left shoulder tenderness at the superior left scapula; pain with motion in the left shoulder; mild crepitus with motion in the left shoulder; tiny nontender lymph nodes over the left mastoid and inside the posterior hairline on the right; and tiny, superficial, itchy abrasions inferior to the right mandible.  Dr. Cole prescribed Meloxicam, Gabapentin, and Vitamin D and indicated physical therapy would be prescribed if her pain worsened.  At this time, the Plaintiff specifically denied nervousness and anxiety.

On August 18, 2020, neurologist, Dr. Michael Morse noted reasonably good control on Primidone and Temazepam.  (ECF No. 10, pp. 552-554).  Unfortunately, the Gabapentin had been ineffective.  And, while the Plaintiff felt the Requip was helpful, she was concerned about the side effects.  Because she was ingesting a significant amount of caffeine, Dr. Morse advised her to drink decaffeinated beverages, gave her permission to take an extra Primidone on the days her tremor was worse, and referred her to Dr. Eckels for her COPD.

That same day, rheumatologist Dr. Song Zang evaluated the Plaintiff for chronic pain and anxiety/depression.  (ECF No. 10, pp. 549-551).  Despite a normal exam, he prescribed Celecoxib (NSAID), Savella, and a trial of Celebrex to treat her fibromyalgia.

On September 20, the Plaintiff advised Dr. Zang that, although it was helpful, she could not afford the Celebrex.  (ECF No. 10, pp. 547-548).  Therefore, he refilled the Celecoxib, discontinued the Savella and Celebrex, and prescribed Pregabalin (treats nerve and muscle pain).

13

Dr. Zang also provided her with a trial of Lyrica, advising her to hold the Neurontin if her insurance covered the Lyrica.

On May 25, 2021, the ALJ contacted Dr. Subramaniam Krishnamurthi for an expert opinion. (ECF No. 10, pp. 770-779). After reviewing her medical records, he opined that the Plaintiff could frequently lift/carry up to 10 pounds, occasionally lift/carry 20 pounds but never lift/carry more; sit for three hours at once for a total of six hours per day; stand/walk for one hour at a time for a total of three hours; frequently reach in all directions, handle, finger, feel, and pull/push bilaterally; occasionally climb stairs and ramps; and never work near unprotected heights or moving mechanical parts. Further, he indicated she could frequently operate a motor vehicle and be exposed to environmental extremes, vibrations, and loud noises.

### IV.    Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at Step Two of the sequential analysis; (3) whether the ALJ properly assessed her subjective complaints; and (4) whether the ALJ's RFC determination is supported by substantial evidence.

### A.    Development of the Record

In her first issue, the Plaintiff maintains that the ALJ failed to fully develop the record because he relied on the opinions of non-examining agency physicians rendered without the benefit of later acquired medical evidence, as well as the assessment of Dr. Krishnamurthi, whom the Plaintiff insists was not qualified as an expert in this case. Following a thorough review of the record, we disagree.

While the ALJ does owe a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts, the ALJ is only required to

develop a reasonably complete record. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see also Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (citing *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). An ALJ need not recontact a treating or consulting physician unless a critical issue is undeveloped, and an ALJ is not required to order medical examinations and tests unless the medical records presented do not provide sufficient evidence upon which a disability determination can be made. *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted). Notwithstanding, there is no requirement that the ALJ's RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Instead, the RFC is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (medical opinion that a claimant is disabled or unable to work is not entitled to controlling weight). Thus, while there must be some evidence of the Plaintiff's ability to function in the workplace, every aspect of the RFC is not required to be supported by a specific medical opinion. *Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 518 (8th Cir. 2019) (quoting *Hensley*, 829 F.3d at 932).

Additionally, and of significance to this case, is the fact that the Social Security Administration revised its medical source regulations for claims filed on or after March 27, 2017. *Revision to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01, at *5844 (Jan. 18, 2017). Under the new regulations, treating physicians are no longer entitled to deference. 20 C.F.R. § 404.1520c(a); *Austin v. Kijakazi*, 52 F.4th 723, 728-30 (8th Cir. 2022) (under revised regulations, treating physicians' opinions are no longer entitled to special deference and prior precedent applying treating-source rule was inapposite). Rather, the ALJ must evaluate medical opinions according to the following factors: supportability, consistency,

relationship with the claimant, specialization, and other factors with the two most important factors being supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), (c)(1)-(5). Thus, the ALJ may rely on the opinions of agency physicians, who are highly qualified physicians and disability experts, when their opinions are supported by the overall record. *Kraus v. Saul*, 988 F.3d 1019, 1025-1026 (8th Cir. 2021).

Here, the record contains treatment notes from the Plaintiff's general practitioner, Dr. Cole; rheumatologists, Drs. Deneke, Branum, and Zang; urologist, Dr. Terrell; gastroenterologist, Dr. Simonian; and neurologists, Drs. Keating, Morse, and Belinga; RFC assessments completed by four agency physicians; a Medical Source Statement prepared by Dr. Cole; the opinion of medical expert, Dr. Subramaniam Krishnamurthi; the results of objective tests, including MRIs, CT scans, and ultrasounds; the Plaintiff's testimony; and the Plaintiff's reports of both symptoms and activities. As we interpret the record, nothing is ambiguous or inadequate such that the ALJ would be required to order a consultative examination or recontact an examining or treating physician. *See* 20 C.F.R. § 404.1520b(b). We find this evidence sufficient to support the ALJ's conclusion that the Plaintiff was not disabled. *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019) (holding ALJ permitted to issue decision without obtaining additional medical evidence where other evidence in record provided sufficient basis for decision).

Contrary to Plaintiff's argument, the mere fact that additional evidence became available after the experts issued their opinions does not render their assessments unreliable. *See McClure v. Saul*, 2022 WL 2072661, at *10 (E.D. Mo. June 9, 2022) (Because agency physician review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision). This is especially true when, as in this case, the later acquired records were

considered by both the ALJ and Dr. Krishnamurthi in his May 2021 interrogatory responses.  (ECF No. 10, pp. 37-41).

There is also no rule that prohibits an ALJ from obtaining the opinion of a medical expert, as opposed to a consultative exam.  *See Coffin v. Sullivan*, 895 F.2d 1206, 1210-1213 (8th Cir. 1990) (discussing due process requirements regarding post-hearing interrogatories); *Passmore v. Astrue*, 533 F.3d 658, 664-666 (8th Cir. 2008) (applying *Coffin* to medical experts).  And, as previously discussed, when the expert's opinion is supported by the overall record, the ALJ is entitled to rely on it.  *See Kraus*, 988 F.3d at 1025-1026.

The Plaintiff, however, argues that the ALJ could not rely on Dr. Krishnamurthi's opinion because the doctor did not examine her.  While this is true, Dr. Krishnamurthi did review her medical records.  The Plaintiff also claims he is disqualified as an expert because he is an elderly and retired cardiologist, educated in India, and who is voicing an opinion in a non-cardiac case. Interestingly, his resume reveals he is a certified disability analyst holding an Oklahoma medical license with certifications in both internal medicine and cardiology, having completed a residency and fellowship in each, respectively, at the Veteran's Administration Medical Center in Bronx, New York.  (ECF No. 10, pp. 754-755).  His primary practice has been in both internal medicine and cardiology, although the Plaintiff is correct in her assertion that his later work was in cardiology.  *Id*.  Aside from her assertions, the Plaintiff has made no showing that Dr. Krishnamurthi is not qualified to serve as a medical expert.  We also note that she failed to raise any concerns regarding Dr. Krishnamurthi's qualifications at the agency level.  Accordingly, we find that a licensed and experienced physician and certified disability analyst is clearly qualified to serve as a medical expert in this case.

Therefore, because the ALJ had ample evidence upon which to base his opinion and was not required to rely on the assessment of a specific examining or treating source in rendering said opinion, the Plaintiff's argument must fail. *Hensley*, 829 F.3d at 932.

## B.     Step Two

Plaintiff next insists that the ALJ erred by failing to include her CFS and essential tremors as severe impairments. At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). Failure to find a particular impairment to be severe at Step Two, however, is not a reversible error unless the ALJ ends his analysis at Step Two. *See Bowen*, 482 U.S. at 156-157 ("failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe"); *Valley v. Astrue*, 2011 WL 5999260, at *2 (E.D. Ark. Nov. 29, 2011) (step two error harmless where ALJ proceeded past step two and considered all of claimant's impairments).

In the present case, the ALJ concluded Plaintiff's fibromyalgia, osteoarthritis, major joint dysfunction, disorder of the gastrointestinal system, anxiety, depression, and personality disorder were severe impairments. (ECF No. 10, p. 32). He determined that her remaining impairments, "including COPD, sleep apnea, tremors and insomnia" were non-severe impairments because they would not result in more than minimal limitations in the Plaintiff's ability to engage in work-

related activities.  The ALJ then proceeded through the remaining steps in the sequential process. Therefore, any Step Two error is harmless unless he also failed to consider it in the RFC determination.

### C.    Subjective Complaints Analysis

The Plaintiff also posits that the ALJ erroneously interpreted her daily activities, failed to set forth the inconsistencies upon which he relied to reject her subjective complaints, and did not provide reasons for discounting her subjective complaints of pain and mental limitation.

An ALJ is required to consider all the evidence relating to a claimant's subjective complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians.  *Id*.  The Eighth Circuit has held, however, that an ALJ is not required to discuss each *Polaski* factor methodically. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005); *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996).  The ALJ's analysis will be accepted if the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints.  *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000); *see also Brown*, 87 F.3d at 966.

While the ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them, he may disbelieve subjective reports that are inherently inconsistent with other evidence.  *Id*.; *see also Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)).

Thus, when, as here, the ALJ considers the relevant factors and discredits the Plaintiff's complaints for good reason, the decision will be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001).

Plaintiff insists that the ALJ's reasons for discounting her complaints of pain and mental limitation are not clear, beyond his finding that they were not objectively verifiable. To the contrary, the ALJ properly considered the inconsistency between the Plaintiff's statements and the objective medical evidence. *See* 20 C.F.R. § 404.1529(c)(2) (ALJ may rely on objective evidence as "useful indicator" in evaluating subjective complaints). He noted that her gait, station, strength, and balance was consistently normal. While there are a few notations that the Plaintiff utilized a cane or walking stick to ambulate, there is no evidence to indicate that an assistive device was prescribed or required. (ECF No. 10, pp. 37-41, 504-510, 528-534). In fact, Dr. Keating indicated the Plaintiff could walk independently. (*Id*. at 481-488).

Further, aside from muscular tenderness, physical exams failed to consistently record limitations in any area(s). For instance, on a few occasions, Dr. Cole noted tenderness in the neck muscles, hips, left shoulder, and mid-calf with a limited ROM in her left shoulder. (ECF No. 10, pp. 430-434, 445-450, 453-458, 468-470, 646-652, 684-692, 734). A weakened grip was also recorded a few times. (*Id*. at 586-587). However, most of her exams were within normal limits.

Regarding her tremor, even at its peak, Dr. Keating documented only a mild to moderate exaggerated physiologic/postural tremor. (*Id*. at 481-488). Thereafter, Dr. Belinga found only a fine tremor in her extremities with normal bulk, tone, strength, ROM, and sensation. (*Id*. at 626-629, 633-638). And, by May 2020, he recorded only minimal shaking. (*Id*. at 639-641).

Further, in May 2021, Dr. Krishnamurthi's indicated she could perform light work with frequent reaching in all directions, handling, fingering, feeling, pushing/pulling, operation of a motor vehicle, and work near humidity/wetness, dust, odors, fumes, irritants, extreme

temperatures, vibrations, and loud noises; occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and she could not climb ladders or scaffolds, or work near unprotected heights or moving mechanical parts.  (*Id*. at 770-779).  *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  While this does differ from Dr. Cole's assessment, the ALJ properly concluded that Dr. Cole's assessment lacked support in the record.

In addition to the objective evidence, the ALJ also considered the conservative nature of her treatment, her favorable response to the treatment modalities implemented, her reported daily activities, and the assessments of both examining and non-examining sources.  (ECF No. 10, p. 38).  *Pierce v. Kijakazi*, 22 F.4th 769, 773 (8th Cir. 2022) (holding a pattern of conservative treatment suggests an impairment is not disabling); *Hensley*, 829 F.3d at 933-34 (holding impairment that can be controlled by treatment or medication cannot be disabling).  The record makes clear that the Plaintiff's impairments were treated via conservative treatment modalities to include medication and supplements.  There are no records to indicate that any of her impairments required hospitalization or surgical intervention during the relevant period.

The ALJ further noted reports that Primidone was effective in significantly reducing her tremors.  *Hensley*, 829 F.3d at 933-34 (holding impairment that can be controlled by treatment or medication cannot be disabling).  Records from Dr. Belinga documented minimal tremor in May 2020.  (ECF No. 10, pp. 639-641).  Dr. Morse also noted that her tremor was reasonably well controlled with medication.  (*Id*. at 552-554).  Thereafter, no shaking was noted by any of the Plaintiff's treating physicians.  The Plaintiff also testified that the combination of her prescribed medications and medical marijuana helped alleviate her daily pain, which she rated as an average

of a 5 on a 10-point scale.  (*Id*. at 59).  *Jones v*. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (holding the mere fact that working may cause pain or discomfort does not mandate a finding of disability).

As for her mental impairments, the ALJ pointed out Plaintiff's failure to seek out formal mental health treatment during the relevant period, as well as the conservative nature of the treatment received from her primary care physician.  (*Id*. at 39).  *See Pierce*, 22 F.4th at 773 (holding a pattern of conservative treatment suggests an impairment is not disabling); *Kirby*, 500 F.3d at 709 (holding that absence of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of mental disability).  Although referred to psychiatry in July 2019, there is no indication she followed through.  *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) (holding failure to follow prescribed medical treatment without good cause is a basis for denying benefits).  There is also no evidence that her mental impairments required hospitalization during the relevant period. Additionally, these records make clear that she was able to communicate with her medical practitioners in an efficient and effective way, without interference from her alleged mental impairments.

At the Commissioner's request, Dr. Hester evaluated the Plaintiff in June 2019 and opined she could communicate and interact in a socially adequate manner, communicate in an intelligible and effective manner, cope with the mental demands of basic work tasks, attend and sustain concentration on basic tasks, sustain persistence in completing tasks, and manage funds without assistance.  (ECF No. 10, pp. 416-424).  During the evaluation, she seemed more concerned with her physical issues than her alleged mental impairments.  This evidence supports the ALJ's conclusion that the Plaintiff was able to independently give and receive information and manage healthcare relationships to obtain beneficial outcomes.

Additionally, the ALJ considered Plaintiff's self-reported activities of daily living.  In adult function reports dated April and August 2019, she acknowledged the ability to care for her dogs, her husband, her sister, and her personal hygiene, although she required some assistance dressing, getting out of the bathtub, and styling her hair; prepare simple meals; perform some light household chores; go outside twice per day; go out alone; shop in stores; watch television; spend time with her husband daily; and spend time with friends twice per year.  (ECF No. 10, pp. 232-239, 257-264).  She indicated that her husband handled the finances, described difficulty getting along with others, and stated that she did not handle stress or changes in routine well.  Further, the Plaintiff used a cane, although it was not formally prescribed by a doctor.  (*Id*. at 504-510, 528-534).

Kenneth Richardson, Plaintiff's spouse, completed his own report describing physical limitations much like those reported by the Plaintiff.  (ECF No. 10, pp. 208-217).  *See Rautio v. Bowen,* 862 F.2d 176, 180 (8th Cir. 1988) (holding that corroborating testimony of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case).  Contrary to her statements, however, he indicated that she got along well with family, friends, neighbors, and authority figures; successfully used a debit card; and conducted research on her phone and computer.  Mr. Richardson also opined the Plaintiff could lift 10 pounds, walk 100 yards, stand for 15 minutes, climb two flights of stairs, kneel for five minutes, and reach for three minutes.

Moreover, we note that the Plaintiff advised Dr. Hester that she had no history of problems getting along with others in the workplace.  (ECF No. 10, pp. 416-424).  Thus, overall, we find that this evidence undermines Plaintiff's subjective complaints and supports the ALJ's RFC finding that she could perform light work with postural, manipulative, and mental limitations.  *See Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (medical evidence "failed to provide strong

support" for claimant's allegations of incapacitating symptoms and limitations); *see also Bryant v. Colvin*, 861 F.3d 779, 782-83 (8th Cir. 2017) (court defers to ALJ's credibility determination if it is supported by good reasons and substantial evidence).

### D.   RFC Determination

Lastly, the Plaintiff contends that the ALJ's RFC assessment fails to account for her CFS and essential tremors.  Further, she asserts that the ALJ improperly rejected the treating source statement of Dr. Michael Cole and failed to order a consultative examination of the Plaintiff rather than sending interrogatories to a cardiologist in a non-cardiac case.

RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545. A disability claimant has the burden of establishing her RFC.  *Vossen*, 612 F. 3d at 1016.  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Harvey v. Colvin*, 839 F.3d 714, 717 (8th Cir. 2016).   Therefore, an ALJ's determination concerning a claimant's RFC must be supported by some medical evidence that addresses the claimant's ability to function in the workplace.  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

As previously mentioned, the ALJ found Plaintiff's fibromyalgia and major joint dysfunction to be severe impairments.  And we note that although fibromyalgia and CFS are different diagnoses, they are characterized by similar symptoms to include diffuse pain and fatigue,

as well as sleep, memory, and mood disturbances.  *See* Mayo Foundation for Medical Education and Research (MFMER), *Fibromyalgia, at* https://www.mayoclinic.org/diseases-conditions/fibro myalgia/symptoms-causes/syc-20354780 (last accessed October 25, 2023); *see also* MFMER, *Myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS), at* https://www.mayoclinic.org/ diseases-conditions/chronic-fatigue-syndrome/symptoms-causes/syc-20360490   (last   accessed October 25, 2023).  In assessing her CFS, the ALJ took notice of Dr. Cole's July 2019 notation that her CFS was severe enough to justify long-term disability as there was no expectation of improvement.  Unfortunately, Dr. Cole's exam findings from the same day revealed only a limited ROM in her left shoulder with normal ambulation, gait, balance, and coordination.  (ECF No. 10, pp. 430-434, 445-450, 646-652).  Despite some anxiety and depression, she remained active, alert, and fully oriented.  These findings are consistent with the overall record showing the Plaintiff to be alert and fully oriented with a normal gait, station, balance, and strength.  (*Id.* at 362-366, 380-385, 441-445, 453-458, 461-465, 468-470, 481-488, 521-527, 547-554, 575-581, 642-646, 708-714, 743).

Further, for the reasons discussed in the previous sections, we also find that the ALJ properly considered Plaintiff's tremors but concluded that they would not significantly affect her ability to perform work-related activities.  As they were effectively treated via medication, there was no need to include additional limitations in the RFC.

The ALJ ultimately found the state agency medical experts' opinions and the opinion of Dr. Krishnamurthi to be persuasive, agreeing that the Plaintiff could perform light work with occasional postural limitations.  In so doing, he correctly noted that these opinions were supported by the experts' review of the medical evidence.  *See* 20 C.F.R. § 404.1520c(b)(2) (stating supportability and consistency are the two most important factors in evaluating opinion evidence

and the assessments of Agency physicians).  The ALJ also properly concluded that these opinions were consistent with the overall medical record documenting Plaintiff's seemingly benign physical exams and favorable response to conservative treatment.  *See Hensley*, 829 F.3d at 932 (RFC based on all relevant evidence, including claimant's own description of her limitations).  After reviewing this evidence, the undersigned finds that the record does not support a more restrictive RFC.

Similarly, the ALJ found Dr. Hester's opinion to be persuasive, but found the opinions of the state agency physicians, who concluded the Plaintiff had no severe mental impairment, to be unpersuasive.  The record clearly reflects that the Plaintiff suffered from depression and anxiety that was severe enough to warrant medication.  It does not, however, document symptoms of such severity that they would preclude her from performing all work-related activities.  As such, we find that the ALJ's limitation to unskilled work was sufficient to account for her mental restrictions.

## V.      Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint (ECF No. 2) be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of November 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE